Good morning. May it please the Court, my name is Betsy Stevens for Anne-Marie Bagby. This is an SSI disability case and Ms. Bagby is disabled dating back to July of 2005 based on post-traumatic stress disorder, generalized anxiety disorder, obsessive-compulsive disorder and panic disorder with agoraphobia. And as far as the medical evidence that we have, we have examining Dr. Dr. Richardson who opined that Ms. Bagby's anxiety disorder was severe enough to meet listing 12.06 and that she had marked impairment in her ability to perform activities of daily living and in her social functioning. Can I focus on the vocational expert dispute as to what elements of the hypothetical that this passage where trial counsel, I mean, not trial, but hearing counsel, which was, I assume, not you. That was not me, sir. Yeah. Okay. So as I understand the dispute that came down was that the ALJ posed a question which you're now, excuse me, saying was incomplete. And the attorney posed a question which triggered a dialogue with the ALJ's part, and I'm looking at ER-332 where it begins. Okay. This comes after the ALJ's hypothetical, just to put it in context. So the ALJ at 330 opposes this hypothetical person has no exertional limits but should have no contact with the public, only occasional interaction with co-workers, and would be limited to simple and repetitive tasks. And then the BE says, well, that's laundry worker and janitor. I think those are the two that survived. He threw in a sandwich maker, but I understand that's not being pressed anymore. So then the attorney says, well, you assume an individual 42 years of age, ninth grade education, with a claimant's past relevant experience, assume this hypothetical person has an extreme limitation relative to contact with the public, which means no public contact, has moderate impairment in terms of and the ability to respond appropriately to changes in the work situation and in a routine work setting. Could that person perform any of the claimant's past relevant work? And then the ALJ says, well, I tried to accommodate those limitations in my hypothetical. There's a dialogue there, and then it comes to the part I'd like your help in translating. The BE says, the moderate, because the term moderate was used in the hypothetical, the moderate really falls into that, most of the time, into that gray area. And of course, we can really add it. It's not additive in nature, adding to moderate, and make them into a marked position. That's one degree of disability, I gather. I would say it would definitely reduce the number of positions. I cannot say it would eliminate all of them. How are you translating that as to the parts that you think should, you're urging on appeal, should have been included? Because I understand you're arguing that it omitted the supervisors and it omitted the ability to adjust to change conditions. Is that correct? That's correct, Your Honor. So what you, it seems that the focus in the dialogue, at least before the ALJ and the BE, was focused more on the question of moderate. So I'm trying to sort out what you're saying is the error here. I'm sorry. Well, first of all, I mean, the definition of moderate, that's something that's never been defined. And I mean, we argue about that every day in these cases, and I think what the vocational expert is saying is that, well, depending on your definition of moderate, those limitations would eliminate a number of the jobs available. Not jobs. She says, the BE says positions, because she said earlier, she says, I don't know, I think it was a woman, but the BE says, there are these jobs, and then would you like me to give you the number of positions in those? And positions is a population of janitors. So the BE says, well, is it more than a thousand? So I'm reading that as saying, yes, it would cut down on, not the jobs, so much as there may be fewer positions within janitorial, or what the other one was. So is that how you're reading this interchange? Well, that's pretty much the same way that we understand it, Your Honor. Our main argument, in addition to that, is that when the trial attorney asked the vocational expert to consider the limitations assessed by Dr. Richardson, who's the other doctor, the vocational expert testified that none of the jobs would be appropriate for a person with those limitations. And it's our position that the ALJ improperly rejected Dr. Richardson's opinion, and had that opinion been properly credited, then we have the BE's testimony that none of those three identified jobs would be appropriate for a person with those limitations. So would we need to agree that the ALJ erroneously discredited or gave less weight to Dr. Richardson's report in order to agree that your client was disabled? Well, that's part of it, but even if you don't agree with that, if you also agree with that the ALJ improperly rejected her own testimony, Ms. Bagby's testimony, I mean, and the lay witness, Mr. Charles Pitt, that her anxiety causes her to not be able to leave the house without a supportive companion present. So if I understand the sequence, the ALJ discredited your client's credibility and discredited Dr. Richardson's conclusions in part because he relied on her self-report. And discredited Mr. Pitt's in part because of that, for the same reason. So is the focus then on her credibility and whether the ALJ was correct or incorrect in holding that she was not credible? Yes, Your Honor, primarily that's the focus. And the reasons why the ALJ found her less than fully credible were primarily because of her ability to perform activities like going to parent-teacher conferences for her children and going to the grocery store, but it's our position that those activities were performed on a sporadic basis or with her boyfriend present. Well, the district court said the only reason of the ALJs that I like is that she was improving on medication, the ALJ found, and she did not testify that. She said she continued the same. So when I looked at the reports, it's very hard, because you're looking at these doctor's scrawlings and the like. But there did seem to be some evidence that she did improve on medication. Could you address that? Well, the record shows that she did improve somewhat, but some of these improvements were temporary in that she responded to the medication. I think it's dopexin for a while, and she felt better initially, but then it stopped having the same effect and she became more anxious again. And while she may have improved to a degree, she didn't improve to the point where she could return to work activity. Let me see if I understand your response to Judge Kluge's question. So I gather, well, I'm not sure I understood your answer, but is it your position that we would have to agree with you that there was air in rejecting Dr. Richardson's testimony in part, and her testimony in order to grant relief here for you? Well, in part. What do you mean by in part? I want to pick up on what Judge Fischer was questioning about on the vocab, on step five. Primarily, we just received a letter from the government, a 28-J letter, drawing our attention to Zabelin v. Colvin with respect to the DOT job classifications and the reasoning ability at issue in that case. In our case, and the government, the little letter says, the commissioner argued that the representative of janitor was appropriate for an individual with plaintiff appellant's limitations. Does our recent decision in Zabelin call that into question? Well, that decision, I believe, was about the DOT reasoning level of the job. And the reason that we don't believe that janitor is appropriate for this particular individual is because she's a survivor of sexual assault, and that's the reason why she has PTSD. And the idea of going through a dark building and opening doors and turning lights on and off, and her anxiety, her doctor said that her anxiety is triggered by encountering strangers or members of the public when she doesn't expect it. And the idea of her performing that job with the limitations that her doctor said that she would have, it doesn't make sense. So that's our position on that. I don't think that it really has to do with the reasoning level of the job. As far as, I mean, she doesn't have a cognitive impairment. So in terms of the things that are omitted from the VE question that weren't incorporated were the change or resistance or difficulty with change and the omission of interaction with supervisors. Those are the two omissions that you're concerned about. Yes, Your Honor. Thank you. Okay, thank you. Thank you. May it please the Court, Jordan Goddard appearing for the Commissioner. I suppose I should start off with the issue of the 28J letter and sort of address that elephant in the room. It sounds like, however, plaintiff appellant seems to be waiving that issue. The argument they made was not premised on GED reasoning levels. So to move on, though, to the residual functional capacity finding, which I think is really at the heart of this case here. The administrative law judge assessed a fairly restrictive RFC for Ms. Bagby, one that completely precluded all public contact. The treatment records indicate that public contact was her main issue. It seemed that she had difficulty in public, although she acknowledged and Mr. Pitt, her boyfriend, acknowledged that in some instances she could go out of the house. Additionally, there is some fairly significant improvement with medication. Definitely her symptoms were not completely alleviated. She is not an individual who functions completely normally in social situations, even with the medication. However, the AOJ was correct in noting that Dr. McCarty's opinion about more severe limitations was inconsistent or was undermined by the fact that only one month later there was improvement on doxepine, as was pointed out. Let's go into this improvement on medication, because that was the district court's key for upholding the AOJ's credibility determination. And in looking through the record, or at least the reports I could find, there are some reports of improvement, and then there are the next. I mean, it's hard to interpret what the doctors are saying, but then the next report is now she's worse again, we'll try a different medicine. So what specifically are you looking at that would say there's a trend of improvement with medication sufficient? I think we're under a clear and convincing standard here, right, to uphold the AOJ's credibility determination? Well, I guess I think we need to, before I can answer that properly, I think we need to figure out if we're talking about rejecting Dr. McCarthy. I'm talking about Ms. Backby's credibility determination, because at least in part the AOJ's determination on Richardson was based on Dr. Richardson is just reporting what she's reporting, and she's not credible. I don't think Dr. Richardson is credible. Now, that wasn't the only reason, but that was one significant reason for rejecting it. So I'd like to focus on Ms. Backby's credibility, and what would be the basis for saying there was clear and convincing evidence that her condition was improving with medication, such that the AOJ didn't err in rejecting her credibility? Before I answer that directly, Your Honor, I'd just like to point out that the standard is not clear and convincing evidence. That is an issue that we in the government have made a number of times. It's clear and convincing reasons, which at least according to the jurisprudence of this Court seems to be in compliance with the substantial evidence standard, or at least is intended to be. And so it is not intended to be a heightened standard, even though clear and convincing does seem to imply that. So what's your best case for saying clear and convincing reasons is the same as substantial evidence? Well, my best case is that the statute says, as we note in our brief, that all findings of fact, if supported by substantial evidence, are to our own. You are talking to the Ninth Circuit here, so I don't know that citing the statute is not just. Oh, I'm sorry. I didn't. You threw me for a second, Your Honor. Yes, the statute does clearly set the standard, and the case law in this circuit is very clear that credibility findings are a matter of fact. So it would seem to implicate the substantial evidence standard, and therefore, since I don't know that the Court has ever really fleshed it out, my understanding is whatever clear and convincing reasons means must be consistent with substantial evidence in order to comply with the statute. And so what's the substantial evidence that supports the continued improvement? I would say, I would point to two things. Oh, the continued improvement. I'm sorry. I was going to go to Dr. Stuckey's opinion first, which is another point that I think the district court overlooked. But to answer your question, Your Honor, if we look at ER-289, this is actually almost two years after she began doxepine, and she is as she tells her treatment provider that she has discontinued doxepine. Plain of Appellant's counsel likes to characterize it as not being effective anymore, but the record actually indicates that she was on it for two years and told her doctor that she was discontinuing it because she didn't feel she needed it anymore. That is a big difference. There's a big difference between a patient announcing to the doctor after two years that she no longer feels this medication is necessary and telling your doctor that it's no longer effective. And the AOJ correctly recognized that she was doing well at the time, and she actually ran out of it because she forgot to fulfill her prescription. But she wanted to talk to the doctor about the possibility of not ever fulfilling the prescription because, to quote, she was doing so well at the time, even without it. Kennedy. Could I get you to, if you finish, I don't know if I've cut off an answer to Judith's question. I see in later reports where she says in 2008, that was in 2007, and in later reports in 2008, she states that she's not feeling well. In a questionnaire, she says, I'm having a much more difficult time leaving the house. In later 2008, Dr. Reinhardt says she didn't tolerate Lexapro, and Clonopin just knocks me out, quoting her, that she has higher anxiety. So what do we do with that for a trend of continued improvement? Well, I think then we have to look at Dr. Stuckey's opinion, because now you're talking about a period of time that is very, very close in time to Dr. Stuckey's evaluation. So if we want to, I think the ALJ was reasonable in looking to Dr. Stuckey's opinion for her condition in 2008. While she is reporting some increased stress that I think was associated with some events, like some deaths of people close to her were noted, seemed to be exacerbating her stress at the time, Dr. Stuckey did an evaluation right around that time. And that evaluation is given great weight by the ALJ, and is what the RFC determination, I think, is most clearly based on is Dr. Stuckey's opinion. So to the degree there is a deterioration in 2008, Dr. Stuckey's opinion is substantial evidence supporting the ALJ's conclusion that it did not, her deterioration in 2008 was not any worse than what you see in the RFC, because it reflects Dr. Stuckey's opinion. OK, so just one last, just on Dr. Stuckey, he had a little different diagnostic assessment, didn't he? Diagnostic, when you say in terms of the actual diagnoses? Yeah, he had pain disorder with agoraphobia and obsessive compulsive disorder. Yes, agoraphobia, I think agoraphobia is recognized in the Diagnostic and Statistical Manual as a specific form of anxiety disorder. Other providers had described it as anxiety disorder with agoraphobia, some version of that. I don't know that Dr. Stuckey's diagnoses vary that much from any other provider in the record. We have obsessive. You mentioned PTSD. He does not, he does not mention PTSD. However, he had all the, he did review all these records. And, in fact, I think, I think he actually analyzes specifically or, actually, is it, yeah, Mark Stuckey. I believe he actually analyzes PTSD specifically in here. I may be confusing it with another evaluation, but I thought he actually felt that it was not appropriate. Judge Fischer had a question for you. Oh, I'm sorry. Before, yeah, there's a rule-out diagnosis where he doesn't. I accept your foundation of Dr. Stuckey. So Dr. Stuckey included that she was moderately limited in her ability to respond appropriately to usual work situations and changes in a routine work setting. The ALJ's hypothetical did not include that specific. The attorney's did, would be moderately impaired in the ability to respond appropriately to changes in the work situation. When confronted with that hypothetical, the VE then responded, as I quoted before, that that would reduce the number of positions, although it wouldn't totally eliminate them. So why isn't that error on the part of the ALJ to have admitted that aspect of the Dr. Stuckey, who, as you said, he gave great weight to? Why isn't that in and of itself an error that would require reversal? Your Honor, to the degree it is an error, we characterize it as harmless because if you look at the form that Dr. Stuckey filled out, it actually gives us definitions for the terms that he was checking on there. This is not an indication where moderate is just something that's out in the air. If we look at ER 301, the definition of moderate is, and I quote, there's more than a slight limitation in this area, but the individual is still able to function satisfactorily. Well, that may be, but the hypothetical that was proposed to the VE by the attorney, not by the ALJ, was moderately impaired in the ability to respond appropriately to changes. That's not a question or a condition that was part of the ALJ's hypothetical. And that elicited a different response from the VE, that the number of positions would be reduced, but not entirely eliminated. So we don't have any finding on the part of the ALJ that ability or the moderate ability to react to changes in the workplace. We don't have any understanding or the, excuse me, ALJ analysis of whether the number of positions would be available to this claimant. If it would reduce the number of positions, doesn't that change the evaluation? You didn't pick up on it and you didn't follow up on it, the ALJ didn't. Yes, Your Honor. But I think under the specific facts of this case and the testimony that was given, I think any error would be harmless. And that is because this VE didn't, this VE actually gave some slightly unusual testimony. Instead of identifying specific job numbers, which is what we prefer, but these are independent experts that we've called. We don't control their testimony. He testified that the job numbers for both of those jobs would be in excess of a thousand jobs. And I think the implication was clearly in the state of Oregon, which under the case law is in excess of what is necessary to constitute significant numbers. And so when the VE testified they would be reduced very shortly after giving that testimony without identifying a specific number, I think the implication on a more for harmless error is that the VE meant to indicate there would be a reduction, but not below that threshold or else he would have indicated he would have modified his answer. And so by the way, he had framed his answer in terms of there are more than a sufficient number of jobs based on the legal standard here. When he then shortly thereafter testified that it would reduce that number without giving any further specification, the implication is that it would not reduce it below the threshold. Let me ask you one other thing about the hypothetical pose to the VEN, the residual functional capacity assessment. So earlier on in the ALJ's decision, he makes reference, or he notes that the claim it has moderate difficulties with regard to concentration, persistence or pace. Yes. Right. Um, that sort of drops out at the end, like as Judge Fisher was mentioning with respect to Dr. Stuckey's assessments, um, does the, does the RFC accommodate that? Yes, Your Honor. The limitation, the limitation is simple repetitive task. It is sufficient in this case. There has been no, uh, no concrete limitation other, uh, beyond that, that has been assessed by, by any, uh, medical professional and under the Stubbs-Danielson case. Well, there was, in Stubbs-Danielson, wasn't there medical testimony that supported the, the, the, uh, RFC? Um, my, my understanding was, uh, the holding is that there is, there was no further evidence in the record of, of limitation. Um, and I guess part of that is maybe me reading the burden of proof into this, that, uh, the claimant has the, the burden to establish these limitations or establish some sort of concrete limitation and to degree our own doctors translate something like a moderate deficiency in that global area into, uh, simple repetitive, uh, we can, we can rely on that unless there is other evidence in there, unless another concrete limitation has been articulated by another doctor and that's not the case here that I'm aware of. Well, so, so is it your position that, that simple repetitive task always accommodates moderate, um, limitations on the ability to concentrate and? No, Your Honor. Uh, my position is that that is a matter that is dependent upon the evidence. And in fact, um, if you look at, for example, the Hoopi case, there's a, there's actually a case, that's actually an example of a case where there was a moderate, uh, deficiency in concentration, persistence or pace, um, found at the step three finding, which is, uh, I believe what you're referring to here. And there was no limitation whatsoever other than a limitation to light work, um, to accommodate the exertional, to accommodate exertional, uh, issues in that. So I think when you look at the case law, the, the, the law of the circuit actually stands for the proposition that there is no, uh, quick fix. Sometimes simple repetitive is, is the appropriate. Sometimes a reduction of light work is appropriate. Sometimes a doctor, doctor has articulated some other limitation to, to accommodate that deficit. Here in the absence of any, any other deficit, um, what the AOJ assessed was sufficient. Let me ask you this. If we were to, to find that there was error in discrediting Dr. Richardson, and if you look at Dr. Richardson's various assessments, um, I think in one of them he uses marked. Um, inability with regard to, with regard to concentration, pace and persistence. Uh, yes, I, I would concede that if, if the evidence establishes a marked limitation in that area that, um, that we have, um, most likely reversible error. But again, our position is that Dr. Richardson's opinion was correctly dealt with by the AOJ. Okay. Thank you. Do you have any rebuttal? You may. Okay. So what we have here is the AOJ's improper rejection of the, of the claimant's testimony and in turn, improper rejection of Dr. Richardson's opinion and the opinion of the lay witness, Charles Pitt. And if this court credits Dr. Richardson, Dr. Richardson's opinion, um, then the vocational expert testimony establishes that none of the jobs identified would be appropriate for Ms. Bagby. And additionally, um . . . Well, that wasn't the only reason that the AOJ rejected Dr. Richardson, right? That was a major part of it. I believe there were a couple of other things too. Yeah. He says Bagby experienced decompensation episodes, but there's no evidence of it. Um, there was changes in the onset date. Um, he focused on the, um, activities of daily living. I mean, he had a number of different reasons for rejecting Dr. Richardson's testimony. Well, Your Honor, as far as the onset date, that's because this is an SSI case and benefits can't be paid any sooner than the month in which he applied for SSI, which is July, 2005. So that's why she changed her onset date. It wasn't because . . . The decompensation episodes. The decompensation episodes. I think in Dr. Richardson's report, he talks about how, what he means by that is that she's having conversations and she doesn't remember what was said, um, because of her anxiety, her heightened anxiety. And that's . . . where she just went outside of herself and didn't remember what had occurred. So I think that's what he was talking about. The court has no further questions. We'll rely on the briefs for the rest. Thank you. Thank you.
judges: Fisher, Paez, Ikuta